PC:DDB
F.#2010R02302

M-11-909

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

ROBERT FINKELSHTEYN and
ALEKSANDR FINKELSHTEYN,

          Defendants.

SEALED COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF ARREST WARRANT
(T. 18, U.S.C., § 1349)

- - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

        NADINE F. BROWN, being duly sworn, deposes and states that she is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

        Upon information and belief, there is probable cause to believe that between April 2007 and August 2009, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants ROBERT FINKELSHTEYN and ALEKSANDR FINKELSHTEYN, together with others, did knowingly and intentionally conspire to execute a scheme and artifice to defraud health care benefit programs, namely, no-fault insurance plans provided by private insurance companies, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, such

health care benefit programs, contrary to Title 18, United States Code, Section 1347.

(Title 18, United States Code, Section 1349).

The source of your deponent's information and the grounds for her belief are as follows:

1. I have been a Special Agent with the FBI for over two years. During that time, I have participated in numerous investigations during the course of which I have conducted interviews, made arrests, executed search warrants and secured other relevant information using a variety of investigative techniques.

2. In addition to my own law enforcement training and experience, I have also worked on this investigation, and had discussions about this case, with other experienced agents and other law enforcement officials. In particular, I have jointly worked on this investigation with Special Agents from the Department of Justice's Health Care Fraud Task Force, United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), and the Internal Revenue Service ("IRS").

3. The facts set forth in this Affidavit are based on my own investigation and also on what I have learned from other agents from ICE, IRS, and the FBI. I have reviewed numerous documents, including bank records, public records, and records from insurance

companies. I have also interviewed witnesses, including a cooperating witness ("CW").[1]

4. Because this Affidavit is submitted for the limited purpose of establishing probable cause to obtain arrest warrants for the defendants, it does not include all of the facts that I have learned during the course of this investigation. Where actions, conversations and statements of others are related in this Affidavit, they are related in substance and in part unless otherwise indicated.

A. Overview of the Scheme

5. Since approximately December 2007, Special Agents from ICE, the IRS, and the FBI, have been investigating an extensive health care fraud and money laundering scheme conducted largely to further the criminal activities of various medical clinics and medical supply companies primarily located in Brooklyn, New York, in committing tax fraud and health care fraud.

6. I have been informed by the CW that from approximately 2005 through 2010, the CW and the CW's partners established and operated several companies that purported to be wholesalers of

---

[1] On February 16, 2010, the CW pled guilty to an information charging him/her with health care fraud, money laundering and defrauding the IRS. The CW executed a cooperation agreement with the government in the hope of obtaining leniency at sentencing. The CW's information has been corroborated by other sources of information, including but not limited to surveillance, confidential sources, and bank and insurance company records. The CW has no prior criminal history.

medical supplies (the "Wholesale Companies").[2] The CW and the CW's partners conspired with owners and operators of medical supply retail companies (the "Retail Companies") that were created purportedly to provide durable medical equipment ("DME")[3] to individuals who were eligible for insurance benefits.

7. The CW has informed me that the objective of the scheme the CW and the CW's partners engaged in with the Retail Companies was to defraud insurance companies and the IRS. As part of this scheme, the Retail Companies submitted fraudulent claims for reimbursable expenses to insurance companies for DME. Such claims sought reimbursement for DME at prices well in excess of those paid by the Retail Companies. These claims were supported by fraudulent invoices created by the CW and the CW's partners in the name of their Wholesale Companies.

8. The CW informed me that to carry out the scheme, the Retail Companies first informed the CW and/or the CW's partners of the information they wanted reflected on the fictitious Wholesale

---

[2] The Wholesale Companies that were used interchangeably in furtherance of this scheme, beginning in approximately 2004, included Corpus Distributors, Inc. ("Corpus"); Fo Bos Trading, Inc. ("Fo Bos"); MDSS Wholesale, Inc. ("MDSS"); Bener Wholesale, Inc. ("Bener"); Deimos Distributors, Inc. ("Deimos"); Riviera Wholesale, Inc. ("Riviera"); Galasa Wholesale, Inc. ("Galasa"); Delazoom, Inc. ("Delazoom"); Herar Trade, Inc. ("Herar"); Narim Wholesale, Inc. ("Narim"); and Collona Distributors, Inc. ("Collona").

[3] DME is defined as equipment that can withstand repeated use, is primarily and customarily used to serve a medical purpose, generally is not useful to a person in the absence of illness or injury, and is appropriate for use in the client's place of residence.

Company invoices, including the inflated rates for the DME. The Retail Companies issued checks to one of the Wholesale Companies in amounts equal to the inflated prices for DME as listed on these fictitious Wholesale Company invoices that they, in turn, used as the basis for fraudulent no-fault insurance claims.[4] The CW and the CW's partners then "laundered" these checks through a check cashing store - i.e., checks were negotiated, and after retaining a portion for the CW and the check casher, the CW and/or the CW's partners returned the remaining cash to the Retail Companies.

9. Based on my conversations with the CW, as well as my examination of documents obtained during this investigation, I know that the Retail Companies' checks and the corresponding fictitious invoices were also used by the Retail Companies to defraud the IRS by under-reporting their taxable income.

10. The CW was informed by the operators of the Retail Companies that the cash they received was used, in part, to pay

---

[4] The New York State no-fault insurance law ("no-fault") regulates all insurance companies that insure motor vehicles. No-fault requires insurance companies to pay up to $50,000 per vehicle occupant for the occupant's "basic economic loss." In order to obtain damages over $50,000, the occupant must have sustained "serious bodily injury" as a result of the accident, as defined by statute. Vehicle occupants can assign their right to reimbursement from an insurance company to others, including, but not limited to, medical facilities and medical supply companies that perform treatment and/or provide medical supplies for their injuries. If such an assignment is made, the medical facility or medical supply company, or its agent, may bill the insurance company directly for services rendered and receive payment directly from the insurance company.

kickbacks to medical clinics for the DME prescriptions that the Retail Companies needed in order to continue the scheme and file further fraudulent claims.

### Probable Cause

11. The investigation of this matter has revealed that between 2007 and 2009, the defendants ROBERT FINKELSHTEYN and ALEKSANDR FINKELSHTEYN, together with others, engaged in a scheme to defraud no-fault insurance plans operated by private insurance companies.

B. Information Provided by the CW

12. I have been informed by the CW that between approximately January 2007 and August 2009, the defendants ROBERT FINKELSHTEYN and ALEKSANDR FINKELSHTEYN engaged in the scheme to defraud no-fault insurance companies and the IRS, as summarized above, by purchasing fraudulent Wholesale Company invoices from the CW and the CW's partners under a Retail Company named ALROF, Inc. ("ALROF") that the defendants established and controlled for this purpose.

13. The CW informed me that the orders the defendants ROBERT FINKELSHTEYN and ALEKSANDR FINKELSHTEYN placed with the CW contained directives regarding the information the defendants wanted the CW and the CW's partners to list on the fictitious invoices. The orders listed specific types, quantities, and prices for DME as they were to appear on the fictitious invoices. The resulting invoices

were fraudulent in that no DME was actually delivered that corresponded to the items listed on the orders, and the prices for DME were grossly inflated, typically charging ten to fifteen times the usual prices paid for the DME items listed. Along with each order, the defendants issued a check from ALROF to one of the Wholesale Companies, in an amount equal to the total of the inflated prices listed on the order. I have been informed by the CW that based on the CW's conversations with the defendants, the defendants then used the fictitious invoices as the basis for fraudulent no-fault insurance claim submissions that enabled them to improperly collect reimbursements well in excess of the actual cost for providing the DME to their patients.

14. The CW informed me that after depositing the ALROF check into one of the Wholesale Company's accounts, the CW or one of the CW's partners then issued a corresponding check to shell companies established by the CW and the CW's partner for this purpose that were then negotiated with a check casher. After paying the check casher's fee of between three and five percent, and subtracting an additional five to eight percent fee that the CW and the CW's partners charged, the CW or the CW's partners delivered the remaining cash back to the defendants ROBERT FINKELSHTEYN and ALEKSANDR FINKELSHTEYN. I have been informed by the CW, that based on conversations that the CW had with the defendants, the defendants subsequently used the negotiated ALROF checks issued to the Wholesale

Companies as the basis for fraudulent business deductions in their company's annual tax filings with the IRS. Additionally, they under-reported their income in the company's annual tax filings with the IRS by not declaring the cash received back from the CW as business income.

15. Based on information provided to me by the CW, the CW estimates that the CW returned to the defendants ROBERT FINKELSHTEYN and ALEKSANDR FINKELSHTEYN in cash approximately ninety percent of the face value of ALROF's checks.

C. Information Obtained Through Bank Records

16. I and other agents conducting this investigation have reviewed and analyzed numerous records, including bank records of the Wholesale and Retail Companies. These bank records corroborate the information provided by the CW regarding the financial interactions between the Wholesale and Retail Companies during the relevant period. In particular, records indicate that approximately 144 checks and one wire transfer were issued from the ALROF account and deposited into the Wholesale Company accounts of MDSS, Bener, and Galasa between April 2007 and August 2009, for an approximate total of $2,929,999.

D. Insurance Company Records

17. Based on documents received from various insurance companies and my conversations with their investigators, I have corroborated the CW's information that the defendants ROBERT

D. <u>Request to Seal</u>

18. This investigation is ongoing. Disclosure of this Affidavit and any arrest warrant could result in the flight of targets, the destruction of evidence and tampering with witnesses.

WHEREFORE, your deponent respectfully requests that arrest warrants be issued so that the defendants ROBERT FINKELSHTEYN and ALEKSANDR FINKELSHTEYN may be dealt with according to law, and that this Affidavit and the arrest warrants be sealed until further order of the Court.

*Nadine F. Brown*
NADINE F. BROWN
Special Agent
Federal Bureau of Investigation

Sworn before me this 12th
day of September, 2011

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

10